# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3302

_____

United States of America

*Plaintiff - Appellee*

v.

Lance Quintin Longie

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Northern

_____

Submitted: October 24, 2025
Filed: July 28, 2026

_____

Before LOKEN, BENTON, and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

In February 2004, Lance Quintin Longie pleaded guilty in a Moorhead, Minnesota state court to criminal sexual conduct in the first degree. He was classified as a Tier III sex offender under Minnesota law, requiring him to register as a sex offender under state law and maintain his federal registration status under the Sex Offender Registration and Notification Act ("SORNA"). Longie was released from custody, commenced supervised release, and registered in Minnesota in 2011. In

2020, he was found guilty after trial of a second Predatory Offender violation in Moorhead state court for knowingly violating registration requirements and intentionally providing false information. He was sentenced to 24 months.

Longie was released by the Minnesota Correctional Facility in St. Cloud on May 31, 2022 after stating on a Predatory Offender Registration Change of Information Form that he would reside at the Dorothy Day House in Moorhead. On June 1, Longie and his mother met with supervised release agent Matthew Rapp to discuss conditions and registration requirements. Homeless at the time (Dorothy Day House did not have space for him), Longie expressed an interest in moving to North Dakota or South Dakota for employment. Agent Rapp explained that Longie must provide specific information and Rapp would then submit an interstate travel application for approval. Longie and Rapp met again on June 15 to discuss registration requirements. He appeared at the Moorhead Police Department and registered as living in Moorhead on June 29. A third meeting was rescheduled to July 14; Longie failed to show and had no further contact with Agent Rapp. Instead, he spent time with his father in North Dakota around the July 4th holiday and later moved to South Dakota to live with his mother. He did not register in North or South Dakota and a warrant issued for his failure to comply with SORNA requirements.

In March 2024, when Longie had not registered with law enforcement for approximately 632 days, the Sheriff's Office in Roberts County, South Dakota received a tip he was residing with his mother in New Effington. Executing the warrant, officers found Longie hiding in the bathroom. He was charged with one count of failure to register as a sex offender in violation of 18 U.S.C. § 2250(a). He entered a not guilty plea, exercised his right to a jury trial, and on the eve of trial submitted jury instruction requests that included an instruction on the "uncontrollable circumstances" affirmative defense in 18 U.S.C. § 2250(c):

**(c) Affirmative Defense.** -- In a prosecution for a violation under subsection (a) or (b), it is an affirmative defense that --

(1) uncontrollable circumstances prevented the individual from complying;

(2) the individual did not contribute to the creation of such circumstances in reckless disregard of the requirement to comply; and

(3) the individual complied as soon as such circumstances ceased to exist.

During the one-day trial, the jury heard testimony offered by the defense to establish an uncontrollable circumstances affirmative defense. The district court[1] excluded testimony from Longie and his mother about "conditions" Longie faced in Minnesota that followed him to North and South Dakota, and threats and threatening behavior by unnamed individuals that allegedly prevented him from fulfilling his registration requirements. At the close of evidence, the district court declined to instruct the jury on the § 2250(c) affirmative defense, rejecting defense counsel's argument that the "treatment, harassment, threats" kept Longie from registering:

> [T]hat's not sufficient. I'm not going to instruct on so-called uncontrollable circumstances. There is absolutely no evidence of that. No credible evidence on that. No evidence of anything reported to law enforcement.

The jury convicted Longie and he was sentenced to 45 months in prison. He now appeals, arguing the district court erred in (1) excluding this testimony and (2) refusing to instruct the jury on his affirmative defense. We affirm.

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

-3-

**Discussion**

**A. Interpreting the Affirmative Defense.** SORNA's legislative history reported that its purpose when enacted in 2006 was to "make more uniform what had remained a patchwork of federal and 50 individual state registration systems, with loopholes and deficiencies that had resulted in an estimated 100,000 sex offenders becoming missing or lost," Nichols v. United States, 578 U.S. 104, 111-12 (2016) (quotation omitted), which was especially troubling because sex offenders have a higher rate of recidivism than other offenders, United States v. Gould, 568 F.3d 459, 472 (4th Cir. 2009) (citation omitted). Congress therefore criminalized knowing failure to register or update a sex offender registration in 18 U.S.C. § 2250(a), subject to the uncontrollable circumstances affirmative defense in § 2250(c). Case law applying § 2250(c) and its three statutory elements is sparse; we have not addressed the defense, nor have many of our sister circuits.

The task of interpreting the meaning of a statute "begins where all such inquiries must begin: with the language of the statute itself. . . . [W]here . . . the statute's language is plain, the sole function of the courts is to enforce it according to its terms. . . . The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." United States v. Ron Pair Enters., Inc. 489 U.S. 235, 242 (1989) (cleaned up). Here, the elements of the defense are spelled out in great detail in § 2250(c) but are not addressed in SORNA's extensive legislative history. The few reported cases addressing § 2250(c) do not "begin[] . . . with the language of the statute itself," so they are not reliable interpretive precedent.

Fortunately, Congress itself provided that guidance by using almost *the exact same language* in a statute enacted a few years before SORNA. See 18 U.S.C.

-4-

§ 3146(c), a provision of Title II of the comprehensive Sentencing Reform Act of 1984, known as the Bail Reform Act amendments.

### § 3146.  Penalty for failure to appear

*     *     *     *     *

**(c) Affirmative defense.**  It is an affirmative defense to a prosecution under this section that uncontrollable circumstances prevented the person from appearing or surrendering, and that the person did not contribute to the creation of such circumstances in reckless disregard of the requirement to appear or surrender, and that the person appeared or surrendered as soon as such circumstances ceased to exist.

The Bail Reform Act dramatically reformed sentencing policy, increasing the number of defendants who are released on bond instead of being detained prior to trial. Congress concluded that defendants released on bond who then abuse that benefit by failing to appear or surrender as required should be subject to a failure-to-appear criminal penalty, but did not impose a criminal penalty on those who "fail[ed] to surrender because they could not do so." United States v. Springer, 51 F.3d 861, 866 (9th Cir. 1995).  Thus, Congress included the statutory affirmative defense.

In Springer, the defendant, a nuclear bomb testing opponent, interfered with an official ceremony by destroying a crystal eagle being received by President Ronald Reagan to call attention to a nuclear bomb test the next day.  He was convicted of interference with the Secret Service, ordered to surrender, and failed to surrender when ordered to do so because "he wanted his surrender to be a media event." Id. at 863.  On appeal, the Ninth Circuit rejected Springer's two asserted defenses to his failure to appear conviction, a necessity defense, which the court held "is inapplicable to cases involving indirect civil disobedience," and the uncontrollable circumstances affirmative defense in § 3146(c).  As to that defense, the court conducted a proper plain meaning analysis:

This language, on its face, exudes a concern that something will actually prevent a person from surrendering. The very idea of "uncontrollable" is something that cannot be managed, something that is ungovernable. The very idea of "prevent" is something that forestalls, frustrates or deprives one of the power of acting. That does not describe a situation where a person sits down and decides that he simply will not do something, even though he can do it. It does not describe a conscious decision-making process wherein a person decides that some political or moral value is simply more important (even much more important) than obeying the law which requires his surrender.

Id. at 866. We agree with this plain meaning analysis of the § 3146(c) affirmative defense. Though the failure-to-register offense in § 2250(a) of SORNA is of course different in ways that must be taken into account in applying the analysis to the § 2250(c) affirmative defense, we conclude that Congress must have ascribed the same plain meaning when it enacted identical affirmative defense language in enacting SORNA little more than 20 years after enacting the Bail Reform Act. So we will apply this plain meaning analysis to the exclusion-of-evidence and jury instruction issues raised on appeal.

The Department of Justice SORNA regulations also help fill the analytical gap in the case law by providing three examples of limited factual scenarios that would justify the § 2250(c) defense.[2] The first example is a sex offender who changes residence from one jurisdiction to another, thereby triggering SORNA's requirement to register within three business days in each jurisdiction where the sex offender resides. If the sheriff's office in his new jurisdiction is unable to meet with him

---

[2]In addressing these Department of Justice regulations, we exercise our "independent judgment" and "seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance . . . ." Union Pac. R.R. Co. v. Surface Transp. Bd., 113 F.4th 823, 833 (8th Cir. 2024), quoting Loper Bright Enters. v. Raimondo, 603 U.S. 369, 394 (2024).

within these three business days, but could do so the following week, the offender would have an affirmative defense for the period before the sheriff's office could register him. 28 C.F.R. § 72.8(a)(2), Example 1. In the third example, a sex offender must travel to a foreign country due to a family or work emergency, causing him to be unable to give 21 days' notice as required by the statute. The offender would have the § 2250(c) defense for this period but not if he failed to provide the registration jurisdiction notice, even if short, of his intent to travel. Id., Example 3. In the second example, registration authorities in a particular jurisdiction "will not register offenders on the basis of the offense for which the sex offender was convicted." The offender has the defense until he becomes aware that the jurisdiction has changed this policy, which is not uncommon. Id., Example 2.

**B. The Exclusion of Evidence Issue.** Longie challenges the district court's exclusion of portions of his testimony and his mother's testimony, most of which the district court deemed irrelevant. "We review a district court's evidentiary rulings for abuse of discretion. Reversal is warranted only if the district court's evidentiary rulings constitute a clear and prejudicial abuse of discretion." United States v. Thurber, 106 F.4th 814, 830 (8th Cir. 2024) (quotation omitted), cert. denied, 145 S. Ct. 1071 (2025). "Federal Rule of Evidence 401 characterizes evidence as relevant if 'it has any tendency to make a fact more or less probable than it would be without the evidence' and the 'fact is of consequence in determining the action.'" United States v. McCorkle, 688 F.3d 518, 521 (8th Cir. 2012). "Although the definition of 'relevant evidence' given in Federal Rule of Evidence 401 is broad, it does have limits." United States v. Hollister, 746 F.2d 420, 422 (8th Cir. 1984) (evidence offered in support of duress defense excluded because it did not contribute to the defendant's alleged reasonable fear of imminent bodily harm).

In this case, on the eve of trial, defense counsel submitted jury instruction requests that included a requested instruction on the "uncontrollable circumstances" affirmative defense in § 2250(c). Nothing in the record on appeal suggests the district

court was otherwise made aware before the trial began that the statutory affirmative defense in § 2250(c) would be an issue.  Indeed, the district court's comments at trial indicated, not surprisingly, that it expected the common law defenses of duress and necessity would likely be at issue in a trial of the government's § 2250(a) charges. As the court explained in Springer, the statutory uncontrollable circumstances affirmative defense is a related modification of these common law defenses.  See 51 F.3d at 867.

**1. Longie's Mother's Testimony.**  The government's evidence at trial included testimony by Longie's father, mother, and two sisters regarding the charge of knowing failure to register.  During Longie's cross exam of his mother's direct testimony, defense counsel began an effort to establish the "uncontrollable circumstance" defense.  The district court sustained government objections and excluded her answers to the following two questions:

> **Defense Counsel**:  You were aware of some issues that [Longie] had in Minnesota, right?
>
> **Longie's Mother**:  Yes, he told me, he called me on a few --
>
> **Government**:  Objection; relevance.
>
> **The Court**:  Sustained.
>
> * * *
>
> **Defense Counsel**:  Have you ever been mistreated in your community as a result of [Longie] having to register?
>
> **Government**:  Objection; relevance.
>
> **The Court**:  Sustained.

After those rulings, defense counsel made no request for a conference outside the jury's presence to explain to the court the defense wished to pursue a § 2250(c) affirmative defense and to show, perhaps with an offer of proof, why the mother's answers to the excluded questions would be relevant to that defense. Cf. Am. Auto. Ins. Co. v. Omega Flex, Inc., 783 F.3d 720, 723-24 (8th Cir. 2015); Fed. R. Evid. 103(a)(2).

Longie argues the district court improperly excluded answers to these questions. We disagree because Longie failed to show that either would contribute to his alleged defense -- that reasonable fear of uncontrollable circumstances prevented him from complying with his registration requirements, as defense counsel later described when Longie testified in his own defense. The first question asked whether she was aware of "issues [Longie] had in Minnesota." But how would those conditions show that something uncontrollable -- something that cannot be managed -- "prevented" Longie from registering, or even contacting SORNA registration agents in Minnesota, North Dakota, or South Dakota, for the 632 days that followed? Longie's mother was present when Agent Rapp explained to Longie what registration required and that he must provide information before Rapp could submit an interstate travel application for approval. She almost certainly knew Longie had not done that when she drove him to South Dakota a few months later, where he lived with her for some 18 months. So she knew he was violating SORNA's requirements.

Longie's mother doubtless also knew Longie did not register or even contact SORNA agents during that 18-month period in South Dakota. Thus, the supposed "issues" Longie had in Minnesota, even if they somehow "prevented" his registration there, did not prevent him from registering in South Dakota during a significant majority of the time alleged in the indictment. Likewise, the second question --"Have you ever been mistreated in your community as a result of [Longie] having to register?" -- lacked any connection to his § 2250(c) defense. Longie began registering in Minnesota almost 18 years before the knowing failure-to-register dates

alleged in the indictment. Longie's purported § 2250(c) defense -- not clearly articulated to the court at the time of these rulings -- required him to establish that uncontrollable circumstances prevented him from complying *during the time alleged in the indictment*. The district court did not err in excluding answers to these questions as not relevant to the defense requested in the defense's pretrial instructions. Even if Longie was subject to threats that made him want to move to the Dakotas rather than maintain his Minnesota registration, he was not "prevented" -- "forestall[ed], frustrate[d] or deprive[d] of the power of acting" in the manner Agent Rapp carefully explained to Longie and his mother was necessary for him to obtain an approved interstate travel application that would allow him to leave the Minnesota SORNA jurisdiction. Instead, he knowingly left Minnesota for 632 days. And Longie made no request to recall his mother after his testimony made his uncontrollable circumstances defense at least somewhat better explained.

**2. Longie's Testimony.** After the government rested, Longie was called as the only defense witness, and the defense continued its effort to establish an "uncontrollable circumstance" defense. The district court sustained government objections and excluded direct testimony about how Longie was treated in South Dakota, including an incident where he was supposedly left beaten on the road:

> **Defense Counsel**: Describe verbal comments that you dealt with while you were in Roberts County.
>
> **Government**: Objection; relevance.
>
> **The Court**: Sustained.
>
> **Defense Counsel**: How were you treated in Roberts County?
>
> **Government**: Objection; relevance.
>
> **The Court**: Sustained.

-10-

**Defense Counsel**: What do you want the jury to know about what happened to you on a road?

**Longie**: I was -- I was left -- well, I was beaten, I was left in the -- I still have the wounds on my legs. I was left --

**Government**: Objection; relevance.

**The Court**: You're not claiming you were beaten up by the police, are you?

**Longie**: I don't know who they are.

**The Court**: Well -- sustained.

After this exchange, defense counsel asked questions more directly related to the uncontrollable circumstances defense:

**Defense Counsel**: Lance, as you sit before the jury today, do you believe you've dealt with uncontrollable circumstances?

**Longie**: Yes.

**Defense Counsel**: What are those?

**Longie**: I had people coming into my mom's house 'cuz they know how to get in. All you had to do is like get a card and you --

**Government**: Objection; relevance.

**The Court**: You're raising the defense of duress?

**Defense Counsel**: Your Honor, Mr. Longie is -- would like to raise the defense of an uncontrollable circumstance and how he was treated. That's his purported testimony.

**The Court**: Well, that's up to me to make that decision not for the jury. You're -- I think -- did I send you some information on what it takes to prove duress?

**Defense Counsel**: In this case, Your Honor, no.

**The Court**: Okay. It's the burden of the Defendant to prove that someone else forced him to commit a federal crime. For example, that he held up a bank because the people with him held him at gunpoint, something of that nature.

But the fact that -- that people don't like sex offenders is not material here. So I'm not going to allow him to do that. I'm sorry.

**Defense Counsel**: Understood, Your Honor.

The government's cross examination of Longie pursued the factual aspects of the defense in greater detail:

**Defense Counsel**: Did you leave [Moorhead] by yourself or were you with other people? . . .

**Longie**: I was forced to leave.

**Government**: Forced to leave by who?

**Longie**: By these people I'm telling you were harassing me.

**Government**: Where did you meet these people at?

**Longie**: They . . . lived around Moorhead. . . . I always had issues around that area.

**Government**: And how did you meet these people?

**Longie**: I don't know, one of them under -- like they -- a lot of these people I meet are the same people that like go to Dorothy Day or go to Churches United or same places that homeless people go to, you know.

**Government**: So you left Moorhead with these people?

**Longie**: Like what I said, I didn't have no choice. . . .

\* \* \*

**Government**: When you left Moorhead, were you with other people?

**Longie**: When I left . . . after I was threatened, I left with my mother.

\* \* \*

**Government**: How come you didn't say anything about this to your parole officer Michael Rapp?

**Longie**: I did, and [unidentified SORNA officials] said who are the names and I said, I don't know, these -- these are the names I think. I don't know their names -- like, if someone is gonna threaten you, they're not going to give you their real name, you know what I mean.

**Government**: And how did they threaten you specifically?

**Longie**: They found out that I had to register.

**Government**: Okay. And how did they threaten you?

**Longie**: I don't know, one of them -- one of them, one of them had a gun, it looked like it was a some kind of revolver or something.

**Government**: What were -- what was the name of the individual that threatened you?

**Longie**: Like I said, I -- I tried to tell [SORNA officials] what their names what I thought they were, but they said that they didn't have nobody there by that name so that must not have been their name.

**Government**: So you don't -- you don't know their names?

**Longie**: I don't know who they really were, no.

\* \* \*

**Government**: Did you go to North Dakota with these individuals? . . .

**Longie**: Did we go to North Dakota? Yes, they brought me to North Dakota, but then they brought me back.

**Government**: So you stayed at your dad's place in North Dakota with these individuals? . . .

\* \* \*

**Longie**: No. My mom is the one that brought me to North Dakota --

\* \* \*

**Government**: When did you go to live at your mom's house?

**Longie**: Probably like -- probably around July 7th, July 6th, somewhere around there. . . .

**Government**: [W]ho drove you there?

-14-

**Longie**: My mom. . . .

* * *

**Government**: And how long had you been living there before you were arrested? . . .

**Longie**: Probably about a year and a half.

* * *

**Government**: [Y]ou knew you had a requirement to register as a sex offender, yes?

**Longie**: Yes. . . .

**Government**: Did you register as a sex offender when you were living with your mom at her home in South Dakota?

**Longie**: No.

**Government**: Nobody at that house you were living with was holding you against your will in that house, correct?

**Longie**: Nobody there, no . . . but like I said, when they leave, these people knew how to get into my mom's house, like all you had to do is get a card and where you lock the door, you put the card in there and come right in, and . . . you know they wanted me to run . . . to get me away from my mom so then they could like do something to me, you know what I mean . . . .

**Government**: Objection, narrative.

**Court**: Sustained. . . .

**Government**: No further questions, Your Honor.

**Court**: Any redirect?

**Defense Counsel**: No, Your Honor. . . . The defense would rest . . . .

These exchanges make clear that the district court allowed Longie to testify to the factual bases of the newly articulated § 2250(c) defense but excluded testimony that did not sufficiently support the § 2250(c) defense because it was up to the court "to make that decision for the jury." We review an evidentiary ruling based on the legal insufficiency of Longie's § 2250(c) defense *de novo*. United States v. Yan Naing, 820 F.3d 1006, 1011 (8th Cir. 2016). "[A] district court properly excludes evidence of the defense if the evidence taken in the light most favorable to the defendant would not support a finding [of the defense] by a preponderance of the evidence." United States v. Myles, 962 F.3d 384, 388 (8th Cir. 2020).

The jury heard Longie's testimony about the threats and their impact, the incident on the road, and the fact that people were watching and coming into his mother's house in South Dakota. But he refused to identify these people, and he never explained how the alleged threats and verbal harassment denied him the ability to register in South Dakota. Longie confirmed that these people knew his status as a sex offender but never explained why they would want to prevent him from registering in South Dakota. Longie's father testified that Longie arrived with two people around the Fourth of July, seemed to be under no pressure or coercion, and left on his own shortly thereafter.

During the government's cross examination, after Longie agreed he was required to register as a sex offender, was registered in Moorhead in June of 2022, and left Minnesota, the jury heard additional testimony relevant to whether Longie was prevented from complying with his registration conditions by uncontrollable circumstances. The district court did not exclude the factual basis for Longie's

implausible contention that threats in Minnesota in July 2022 prevented him from even attempting to register in South Dakota for 632 days after he violated known conditions for his sex offender status by going there without interstate travel approval. The court did not err in concluding that this evidence taken in the light most favorable to Longie would not support a finding that the three elements of the § 2250(c) defense were established by a preponderance of the evidence.[3] There was no error in excluding portions of this testimony inconsistent with this legal principle but allowing the jury to consider Longie's claims of threat in deciding whether the government had proven a § 2250(a) violation.

Even if the district court did err in excluding portions of either Longie or his mother's testimony, we have no difficulty concluding such an error was harmless beyond a reasonable doubt. See United States v. Herbst, 668 F.3d 580, 585 (8th Cir. 2012) (standard). The government introduced evidence that strongly established Longie's guilt of a § 2250(a) violation, including testimony that he was living in his mother's house of his own free will, knowing he had left the Minnesota jurisdiction without the travel approval required and knowing his SORNA obligations require that he attempt to register in South Dakota. The excluded testimony, tangentially related to a § 2250(c) defense, had minimal relevance at best. The court permitted Longie to testify about many details relating to a § 2250(c) defense, such as being threatened with a revolver, more than supporting the inference that any error did not contribute to the jury's verdict of a knowing § 2250(a) violation. See id. at 585-86.

**C. Denial of Jury Instruction.** We review *de novo* whether a defendant has produced enough evidence to warrant an instruction on an affirmative defense.

---

[3]Longie must show he encountered "uncontrollable circumstances" that "prevented [him] from complying," did not contribute to those circumstances in "reckless disregard of the requirement to comply," and complied as soon as "such circumstances ceased to exist." § 2250(c)(1)-(3).

United States v. Ladeaux, 61 F.4th 582, 586 (8th Cir. 2023). "A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." United States v. Diaz, 736 F.3d 1143, 1149-50 (8th Cir. 2013) (quotation omitted). To receive a § 2250(c) jury instruction, Longie had to provide sufficient evidence to establish all three elements of the statute, a burden he cannot carry for at least elements one or three.[4]

Section 2250(c)(1) requires that the defendant establish "uncontrollable circumstances" that "prevented the individual from complying." In this case, Longie's evidence at best only supported that he faced uncontrollable circumstances, not that they prevented him from complying. Longie claimed he faced harassment and threats, but when pressed on the specific details of the threats, Longie repeatedly equivocated, saying "I don't know" and struggling to come up with any details that could be independently corroborated. Even if we assume the threats could constitute uncontrollable circumstances (we do not decide that issue), Longie still failed to meet this element because he never tied the threats to his inability to register. Nowhere is there evidence how or why the unidentified harassers prevented him from going to law enforcement, except for one solitary comment that he did not register because he was threatened. Longie may have been scared, but his subjective feelings are not sufficient to satisfy § 2250(c)(1). See United States v. Picard, 995 F.3d 1, 5 (1st Cir.), cert. denied, 142 S. Ct. 619 (2021). Furthermore, the government introduced evidence casting grave doubt on the validity of this testimony -- specifically, that Longie told his parole officer he was moving for work opportunities, not because of threats, and that he was not held in his mother's house against his will. Taken together, Longie did not meet his § 2250(c)(1) burden to demonstrate that "uncontrollable circumstances prevented [him] from complying."

---

[4]Because Longie cannot establish § 2250(c)(1) or (c)(3), we see no need to address whether he satisfied § 2250(c)(2).

In addition, § 2250(c)(3) requires the defendant to comply as soon as the uncontrollable circumstances cease. Here, Longie never took *any* steps to ensure compliance in the face of these threats. He was found hiding in his mother's bathtub at the end of 632 days of knowing noncompliance. His defense necessarily rested on the premise that these individuals harassed him continually for 20 months and prevented him from registering during this entire period. But the sheer length of time Longie did not register, as well as his initial unauthorized trip to North Dakota where he did not appear in distress, cast overwhelming doubt on this premise. Longie testified that he was unable to report his harassers to law enforcement because he did not know their names. But he offered no corroborative evidence from a Dorothy Day House official or resident, he intentionally left Minnesota instead of attending a third compliance meeting with Agent Rapp, and he never went to the Roberts County Sheriff's Office to tell them about his lapsed registration or explain its cause during the 20 months he did not register and a warrant was outstanding for his SORNA noncompliance.[5] Longie failed to show that he made any effort to comply as "soon as such circumstances ceased to exist."[6]

---

[5]In Picard, the First Circuit upheld the district court's refusal to instruct on the § 2250(c) affirmative defense by a defendant who claimed his registration instructions "bewildered" him and were "not clear," noting the defendant had not made "any effort to contact either Probation or the . . . Sheriff's Department to clarify his registration obligations." 995 F.3d at 5.

[6]Longie's brief emphasizes that the district court mischaracterized his proffered defense as "duress" when he first offered testimony at trial purporting to support this undisclosed defense theory. But as explained, the district court understandably assumed Longie was raising the related duress defense. As Longie's evidence did not support the well-established elements of a duress defense, its refusal to give the proffered jury instruction was sound. Longie and defense counsel were responsible for any misunderstanding, which did not affect the merits of its instruction decision.

Because Longie failed to produce evidence that would satisfy all three elements of the § 2250(c) statutory affirmative defense to the government's overwhelming evidence of his knowing failure to comply with his known registration obligations for 632 days, and because the excluded portions of both his and his mother's testimony were irrelevant to that determination, the district court properly denied instructing the jury on the defense.

For the foregoing reasons, the judgment of the district court is affirmed.

_____